*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0716, A15-0717**

In the Matter of the Welfare of the Children of:
B. A. G. and M. R. G., Parents

**Filed November 9, 2015
Affirmed
Worke, Judge**

Rice County District Court
File Nos. 66JV142844; 66JV15500

Adam Elling, Patton, Hoversten & Berg, P.A., Faribault, Minnesota (for appellant
B.A.G.)

Stephen R. Ecker, Faribault, Minnesota (for appellant M.R.G.)

G. Paul Beaumaster, Rice County Attorney, Terence Swihart, Assistant County Attorney,
Jennifer J. Nelson, Assistant County Attorney, Faribault, Minnesota (for respondent)

Heather Feikema, Hastings, Minnesota (guardian ad litem)

Considered and decided by Kirk, Presiding Judge; Worke, Judge; and Smith, Judge.

**U N P U B L I S H E D   O P I N I O N**

**WORKE**, Judge

In these consolidated appeals, parents challenge the termination of their parental

rights to their four children, arguing that the record does not support the district court's

determinations that (a) they failed to satisfy the duties of the parent-child relationship; (b)

they are palpably unfit to parent; (c) they failed to correct the conditions leading to the

out-of-home placements; (d) the children are neglected and in foster care; and (e) termination is in the children's best interests. We affirm.

## FACTS

Appellant-mother B.A.G. and appellant-father M.R.G. are the parents of four children, M.R.G., Jr., born in 2011, L.W.G., born in 2012, and twins J-C.D.G and J-T.D.G, born in 2013. Respondent Rice County filed a child protection report for the children on March 3, 2014, after it was alleged that the parents had no money and could not provide food for the children, M.R.G. was "inappropriate" with the children, B.A.G. "often ignored the [c]hildren because of her preoccupation with [M.R.G.]," M.R.G., Jr. had "only recently learned to crawl . . . and the parents kept him strapped in a car seat most of the time," and the family was living in squalor. Police verified the unsanitary condition of the family home, and the children were removed from the home and remained in foster care until the parents' rights were terminated.

After the children were adjudicated in need of protection or services (CHIPS), the district court adopted out-of-home placement plans for each child that required the following:

> a. Each parent obtain and maintain safe and stable housing appropriate for the Children;
> b. Each parent complete a psychological evaluation and follow the recommendations of the evaluations;
> c. Each parent participate in and successfully complete a parenting education course;
> d. Mother participate in individual therapy at the rate, frequency, and duration deemed appropriate by her therapist;
> e. Father participate in anger management therapy;
> f. Father comply with all conditions of probation as ordered in a separate Rice County criminal file;

2

g. The parents cooperate with signing all releases and referrals for RCCS [Rice County Child Services];
h. The parents cooperate with child development services for the Children.

During the next few months, the family received services to address their various needs and to assist them in completing the out-of-home placement plans.

*M.R.G.* A limited psychological evaluation of M.R.G. was done, and he was found to have an IQ of 71, which is at "the low end of the borderline range of intellectual functioning." M.R.G. was also diagnosed with "mixed personality disorder with antisocial and borderline features," and "intermittent explosive disorder." The parents agreed early in the case that they have an "on-again, off-again relationship with episodes of domestic violence." At the time of his evaluation, M.R.G. was on probation for third-degree assault for a 2010 offense that involved B.A.G. as a victim, as well as a 2011 offense of aiding and abetting 5th-degree simple robbery. Although M.R.G. completed an anger management course in 2010, he was again required to complete another course as a condition of probation.

Three months after the children were placed out of home, M.R.G. was charged with third-degree assault for punching B.A.G. in the nose in front of the children during supervised visitation; the district court later found credible the testimony of a county social worker who saw the aftermath of the attack.

*B.A.G.* A limited psychological evaluation of B.A.G was also done, and she was found to have an IQ of 79, which, at the high end of borderline intellectual functioning, made it difficult for her to learn, reason, or plan ahead. She was diagnosed with "mixed

3

personality disorder with borderline co-dependent features" that are manifested "in a desperate need to maintain her attachment to [M.R.G.] and a willingness to do anything to keep that relationship from ending." A parenting care assessor concluded that B.A.G. was "incapable of recognizing the [c]hildren's needs and prioritizing those needs over her own" and "expressed concerns about [B.A.G.'s] ability to keep up with the [c]hildren," even in the confined supervised visitation setting. The district court found, based on the testimony of numerous witnesses, that B.A.G. "continues to place her own needs above those of the [c]hildren by remaining in a volatile relationship and failing to address her own mental health needs." Although the parents agreed that they were living in an unsanitary and unsafe home at the time of the CHIPS petition, they eventually moved to an apartment that had so many people living in it that the social worker "'lost track' of how many people" lived there.

Neither parent progressed in the services ordered by the district court, nor did they go further with psychological assessments that would have led to useful recommendations. They stopped early childhood special education services (ECSE) for M.R.G., Jr. in December of 2013. They met with a parenting mentor, but when the mentor left her job, they did not arrange for another. M.R.G.'s attendance at anger management classes was "sporadic."

*The Children* All of the children are developmentally delayed. At two-and-a-half, M.R.G., Jr. "was not able to speak and had very limited mobility." At one-and-a-half, L.W.G. "was unable to walk or pull himself up via stable furniture." The twins, at six months, "had misshapen heads which appeared to be due to lying on their sides o[r] back

4

for the majority of the time with little activity," and the social worker testified that "these delays were at least partially attributable to inaction by the parents."

According to the social worker, the parents "minimized the seriousness" of the children's delays after the children were declared CHIPS. B.A.G. testified that she believed that the children would outgrow their delays. The social worker testified that the "parents were just mechanically following instruction when prompted" with regard to ECSE.

Nine months after the CHIPS petition was filed, the county petitioned to terminate the parties' parental rights. Following a four-day trial, the district court ordered the parents' rights to their children terminated under Minn. Stat. § 260C. 301, subd. 1(b)(2), (4), (5) and (8) (2014). The testimony of the guardian ad litem, social worker, parenting assessor, psychologist, and others, were supportive of termination. Each parent separately appealed, and this court consolidated their appeals.

## D E C I S I O N

> [O]n appeal from a district court's decision to terminate parental rights, we will review the district court's findings of the underlying or basic facts for clear error, but we review its determination of whether a particular statutory basis for involuntarily terminating parental rights is present for an abuse of discretion. In doing so, we are mindful that, in termination proceedings, the burden of proof is upon the petitioner and is subject to the presumption that a natural parent is a fit and suitable person to be entrusted with the care of a child. We require that the evidence relating to termination must address conditions that exist at the time of the hearing, and that it must appear that the present conditions of neglect will continue for a prolonged, indeterminate period. Finally, this court, while giving deference to the

5

findings of the [district] court, will exercise great caution in termination proceedings.

*In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 901-02 (Minn. App. 2011) (quotation omitted), *review denied* (Minn. Jan. 6, 2012).

### *Refusal or Neglect to Comply with Parental Duties*

The rights of a parent to a child may be terminated if "the parent has substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon that parent by the parent and child relationship." Minn. Stat. § 260C.301, subd. 1(b)(2) (2014). This conduct is shown by the failure to "provid[e] a child with necessary food, clothing, shelter, education, and other care and control necessary for the child[.]" *Id.* This statutory ground requires the social services agency to have made reasonable efforts to correct the conditions that formed the basis of the petition or to show that such efforts are futile. *Id.*

This statutory ground supports termination in this case. The district court concluded that the parents failed to substantially provide the children with safe or stable housing, complete the psychologist's evaluation or follow recommendations, attend individual therapy (B.A.G.), attend anger management therapy (M.R.G.), comply with probation terms (M.R.G.), or cooperate with child development services "to prove that they could or would continue with such services in the future." The parents both appear to argue that the district court did not give proper consideration to their efforts. The district court noted their efforts, but found that they were "sporadic" or otherwise lacking. The record supports this determination. *See In re Welfare of Children of K.S.F.*, 823

6

N.W.2d 656, 666 (Minn. App. 2012) ("Failure to satisfy requirements of a court-ordered case plan provides evidence of a parent's noncompliance with the duties and responsibilities" of a parent); *In re Welfare of H.K.*, 455 N.W.2d 529, 533 (Minn. App. 1990) (upholding termination of parental rights when parents did not live in a stable housing and failed to take advantage of programming offered to them).

*Palpable Unfitness*

A district court may terminate parental rights on this statutory ground if there is a

> [c]onsistent pattern of specific conduct before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be of a duration or nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental, or emotional needs of the child.

Minn. Stat. § 260C.301, subd. 1(b)(4) (2014). The district court found that the parents demonstrated "a consistent pattern of specific conduct or specific conditions" that are continuing and are "permanently detrimental to the welfare of the [c]hildren." The court found that the parents made no meaningful changes in their parenting of the children over the course of the CHIPS proceedings to provide parenting that was appropriate for the children's ages and special needs, noting that appellants were unable to meet the children's needs "even in a controlled environment." The parents' low intellectual functioning, which, by itself is an insufficient basis to terminate parental rights, affected the parents' abilities to parent and provide a safe home for the children. Further, the unbroken pattern of domestic violence between the parents, such as the parents' inability to provide a safe home for the children, was not alleviated over the course of the CHIPS

7

proceedings, and these facts support the district court's decision on this statutory termination factor. *See In re Welfare of P.J.K.*, 369 N.W.2d 286, 290-91 (Minn. 1985) (affirming termination of low-intellect father's parental rights to his special-needs children when "father could not grasp even the most basic parenting skills" and "[w]hat appearances the father has made in the children's lives has produced trauma"); *see In re Children of T.R.*, 750 N.W.2d 656, 662 (Minn. 2008) (stating that a parent's rights may be terminated for palpable unfitness when the parent's mental limitations "directly affect[s] the ability to parent").

### *Reasonable Efforts of County to Correct Conditions*

Parental rights may be terminated under Minn. Stat. § 260C.301, subd. 1(b)(5) (2014), if "following the child's placement out of the home, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the child's placement." A presumption that reasonable efforts have failed applies if (1) a child is under eight years of age and has been placed out of home by court order for six months, (2) "the court has approved the out-of-home placement plan," (3) the conditions that caused the placement have not altered, and (4) the social services agency made reasonable efforts to rehabilitate the parent and reunite the family. *Id*.

Appellants' arguments focus on the reasonable efforts of the county and the district court's findings to support them. B.A.G. argues without citation to the record that her failure was predetermined because a parenting assessor purportedly stated that her "rights should be terminated regardless of the progress she ma[de] in the recommendations." Only B.A.G. agreed to take a parenting assessment. The assessor

8

made an ultimate recommendation of termination based on a comprehensive study of B.A.G. and the family. She testified that she recommended termination even if B.A.G. was able to follow through with parenting recommendations, but qualified that statement by stating that this applied only to the period of the assessment and that it would be "very, very difficult" for B.A.G. to become a satisfactory parent under the circumstances presented. As such, contrary to B.A.G.'s claim, the parenting assessor's description of B.A.G.'s parenting challenges did not foreclose her from being able to parent.

M.R.G. argues that the district court failed to make findings on the county's reasonable efforts or how the parents failed to comply with the case plan. The record shows that the county offered services directed at the out-of-home placement plan, including supervised visitation, anger management training, parenting assessments, psychological evaluations, parenting education, ECSE, and housing resources. The county's efforts were reasonable considering the issues presented by the family, and the district court's findings reflect this. Despite being offered numerous services, the parents refused some services and did not fully engage in others, and their conduct remained essentially unchanged during the CHIPS period. The district court made findings that demonstrate point-by-point how the parents did not accomplish each of the case plan directives, and the district court's cumulative findings fully support both that the county's efforts were reasonable, and that those reasonable efforts failed to correct the CHIP conditions that led to the children's out-of-home placement.

*Neglected and in Foster Care*

Termination of parental rights may be ordered when a "child is neglected and in foster care." Minn. Stat. § 260C.301, subd. 1(b)(8). This status is attached to a child who is "placed in foster care by court order," who cannot be returned to parents because of the parents' "circumstances, condition, or conduct," and whose parents have failed to "make reasonable efforts to adjust their circumstances, condition or conduct," despite the offer of rehabilitative services. Minn. Stat. § 260C.007, subd. 24 (2014). In finding this statutory basis for termination met, the district court noted the one-year period the children had been in foster care, found the services provided to the parents were "appropriate and reflected reasonable efforts" by the county, found that the parents, despite being given proper time to correct the conditions that led to the out-of-home placement, had not done so. The record supports application of this statutory ground for termination of parental rights.

*Best Interests of Children*

In addressing the children's best interests, the district court said:

> The children have been in out-of-home placement for over a year. In that time their developmental delays have improved based upon the ongoing work that has been performed by ESCE and the engagement by the foster parents. The [c]hildren will continue to need the assistance of these professionals, and the [c]ourt does not believe that the parents are willing to continue engaging in these services to address the [c]hildren's needs. The [c]hildren deserve to be in an environment that is free of domestic violence and where their needs come first. The parents have been unable to place the needs of their children above their own needs, and will be unable to do so for the foreseeable future.

10

> Although the [c]ourt is convinced that the parents love the [c]hildren, the [c]hildren also need parents who are committed to helping them to overcome their significant developmental delays and who are willing to provide a safe, stable environment. At this time, the [c]ourt is convinced that the parents are too preoccupied with their own dysfunctional relationship to make such a commitment. The [c]hildren's needs outweigh the parent[s'] interests in preserving the parent-child relationship, and therefore termination of parental rights of both parents is in the [c]hildren's best interests.

This determination is borne out by the district court record and satisfies the best-interests analysis required by law. *See* Minn. Stat. § 260C.301, subd. 7 (2014) (stating that best interests of children is "paramount" in permanency proceedings); Minn. R. Juv. Prot. P. 39.05, subd. 3(b)3(i)-(iii) (setting forth factors to determine best interests of children).

**Affirmed**.